IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EVERS WELDING COMPANY, INC.
4849 Blue Rock Road
Cincinnati, Ohio  45253

    Plaintiff,

-vs-

WESTCHESTER SURPLUS LINES
  INSURANCE CO.
500 Colonial Center Parkway, Suite 200
Roswell, Georgia  30076

    Defendant.

SERVE:  Mark G. Irwin, Registered
Agent

Case No. <u>1:09-cv-945</u>

(Judge <u>Speigel</u>  )

**COMPLAINT**
**(JURY DEMAND)**

Plaintiff Evers Welding Company, Inc. for its Complaint against Defendant Westchester Surplus Lines Insurance Company states as follows:

## PARTIES

1.    Plaintiff Evers Welding Company, Inc. ("Evers") is an Ohio corporation with its principal place of business located at 4849 Blue Rock Road, Cincinnati, Ohio  45253.

2.    Westchester Surplus Lines Insurance Company ("WSLIC") is a Georgia corporation with its principal place of business located in Roswell, Georgia.

## JURISDICTION

3.      Jurisdiction is proper in this Court pursuant to 28 USC §1332 because this is an action between citizens of different states, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

## VENUE

4.      Venue is proper in this Court pursuant to 28 USC §1391(a)(2) and (c) because a substantial portion of the events giving rise to the claim occurred herein, and WSLIC was subject to personal jurisdiction herein at the time that this action was commenced.

## FACTS

**A.      WSLIC Insurance Policy.**

      **i.      Acquisition of Policy**.

5.      WSLIC issued a Commercial General Liability Insurance Policy ("WSLIC CGL Policy") number G21983937001 to Evers for the period 1/1/06 to 1/1/07.

6.      A copy of the WSLIC CGL policy is attached hereto as Exhibit A.

7.      Evers paid a $70,679.00 premium for the WSLIC CGL Policy.

8.      The WSLIC CGL policy was issued to Evers in the State of Ohio.

9.      Ohio law applies to the interpretation and application of the Evers' WSLIC CGL Policy.

      **ii.      WSLIC CGL Policy Provisions – Coverage**.

10.      The WSLIC CGL Policy provided limits of $1,000,000.00 each occurrence, subject to a $2,000,000.00 general aggregate.

11.     The WSLIC CGL Policy provides bodily injury and property damage liability coverage as follows:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1.      Insuring Agreement**

        a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

        b.     This insurance applies to "bodily injury" and "property damage" only if:

            (1)     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

            (2)     The "bodily injury" or "property damage" occurs during the policy period; . . .

12.     The WSLIC CGL Policy defines "property damage" as follows:

"Property damage" means:

        a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

        b.     Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

13.     The WSLIC CGL Policy defines "occurrence" as follows:

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

3

14.     The WSLIC CGL Policy defines "occurrence" as an "accident" without delineating between tort or contract for purposes of coverage.

15.     The term "accident" is not defined in the WSLIC CGL Policy.

16.     The term "accident" as used in the WSLIC CGL Policy is to be given its ordinary meaning.

17.     The ordinary meaning of the term "accident" in an insurance policy refers to unintended or unexpected happenings.

18.     An accident covered by the WSLIC CGL Policy includes acts not done with the intent or expectation of causing damage or injury.

19.     An accident covered by the WSLIC CGL Policy includes an unusual, fortuitous, unexpected, unforeseen or overlooked event.

### iii.    <u>WSLIC CGL Policy Provisions – Exclusions</u>.

20.     The WSLIC CGL Policy sets forth certain exclusions regarding bodily injury and property damage liability coverage.

21.     Due to the existence of coverage exclusions in the WSLIC CGL Policy, a general presumption exists that that which is not clearly excluded from the operation of the policy is included in the operation thereof.

22.     WSLIC bears the burden of demonstrating the applicability of its policy exclusions to deny property damage liability coverage to Evers under the WSLIC CGL Policy.

23.     In order to defeat property damage liability to Evers under an exclusion in the WSLIC CGL Policy, WSLIC must demonstrate that the particular exclusion it relies upon is capable of the construction it seeks to give it, and that such construction is the only one that can be fairly placed upon the language.

24.   The WSLIC CGL Policy contains a Contractual Liability Exclusion at Section I.2.b

which provides:

**2.**   **Exclusions**

This insurance does not apply to:

. . .

**b.**   **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.
This exclusion does not apply to liability for damages:

(1)   That the insured would have in the absence of the contract or agreement; or

(2)   Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a)   Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b)   Such attorney fees and litigation expenses are for defense of that party against a civil party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged

25.   The WSLIC CGL Policy contains a Damage to Property Exclusion at Section 1.2.j

which provides in relevant part:

**2.**   **Exclusions**

This insurance does not apply to:

. . .

**j.      Damage to Property**

"Property damage" to:

(1)     Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

. . .

(3)     Property loaned to you

(4)     Personal property in the care, custody or control of the insured; . . .

26.     The WSLIC Policy Contractual Liability Exclusion is a "business risk" exclusion.

27.     The WSLIC CGL Policy Damage to Property Exclusion is a "business risk" exclusion.

28.     The business risk exclusions in the WSLIC CGL Policy do not defeat property damage coverage for collateral damage to property other than the insured's property.

29.     The business risk exclusions in the WSLIC CGL Policy do not defeat property damage coverage for consequential damages to property other than the insured's property.

30.     The WSLIC CGL Policy covers acts by Evers which cause an accident.

31.     A covered accident under the WSLIC CGL Policy includes collateral damage to property other than the insured's property.

32.     A covered accident under the WSLIC CGL Policy includes consequential damages to property other than the insured's property.

**iv.**   **Policy Provisions – WSLIC Duties**.

33.   WSLIC had a duty to defend Evers under its WSLIC CGL Policy against any suit seeking damages for property damage to which the WSLIC CGL Policy applied.

34.   WSLIC had a duty to indemnify Evers against any damages for property damage to the Limits of Insurance of the WSLIC CGL Policy and to which the WSLIC CGL Policy applied.

35.   WSLIC's duty to defend Evers and its duty to indemnify Evers under the WSLIC CGL Policy are separate and distinct duties.

36.   WSLIC had a duty to defend Evers against a claim potentially or arguably within the WSLIC CGL Policy coverage.

37.   WSLIC had a duty to indemnify Evers against a claim where the facts demonstrated that coverage existed under the WSLIC CGL Policy.

**B.**   **Evers-AmQuip Agreement – Crane and Crew**.

38.   In August 2006, Evers was a contractor on the Port Union Distribution Center Project ("Project") located at 5003 Union Center Boulevard, West Chester, Ohio  45069.

39.   Evers was erecting and installing tilt-up concrete panels on a building located on the Project.

40.   In connection with its erection/installation operation, Evers arranged with the AmQuip Corporation ("AmQuip") located at 925 Laidlaw Avenue, Cincinnati, Ohio  45237 to secure the services of a crane and a two-man crew – an operating engineer and an oiler.

41.   AmQuip is in the business of providing cranes and related services, including crews.

42.   AmQuip holds itself out as providing "the finest most skilled, safe group of operating engineers in the [crane supplying] industry."

43.     Evers contracted with AmQuip for AmQuip to provide Evers with a crane and crew for use on a daily basis, as needed, to erect and install the tilt-up building panels on the Project.

44.     Evers needed to utilize AmQuip crane and crew for approximately four to six days to erect and install the tilt-up building panels on the Project.

45.     On a daily basis Evers would complete a document that recorded the number of hours the AmQuip crane and crew had been in use that day.

46.     Evers paid an hourly fee to AmQuip for the crane and its crew.

47.     AmQuip paid the salary, benefits, taxes, and maintenance costs associated with the AmQuip crane and its crew.

48.     AmQuip retained control over the hiring and firing of the AmQuip crane's crew, including its operating engineer.

49.     AmQuip retained the right to substitute a different but equivalent AmQuip crane for Evers' use on the Project.

50.     AmQuip retained the right to substitute a different operating engineer for the AmQuip crane.

51.     On August 5, 2006, AmQuip substituted a different operating engineer, Mr. Mark Snelling, for the AmQuip operating engineer who had previously been operating the AmQuip crane on the Project under the Evers-AmQuip contract.

52.     On the Project, Evers' personnel told the AmQuip crane operating engineer where the tilt-up building panels were to be erected and installed.

53.     On the Project, Evers' personnel assisted the AmQuip operating engineer by rigging the tilt-up building panel load and signaling the AmQuip operating engineer when to make his lift.

54.     At all material times on the Project, under the Evers-AmQuip contract the AmQuip operating engineer retained exclusive control over the manner and method in which the AmQuip operating engineer operated the AmQuip crane during all lift operations.

55.     At all material times on the Project, under the Evers-AmQuip contract Evers had no right to control the method and manner by which the AmQuip operating engineer operated the crane during lift operations.

C.     **The Evers-AmQuip Agreement – Specific Provisions**.

56.     A copy of the daily document used to record the number of hours that the AmQuip crane and crew were used by Evers on the Project on August 5, 2006 is attached as Exhibit B.

57.     The 08/05/06 document is titled "AmQuip Rental Agreement" (hereafter "Evers-AmQuip Agreement").

58.     The reference to the Evers-AmQuip Agreement as a "rental agreement" is not determinative of the true nature of that contractual arrangement between Evers and AmQuip.

59.     The true nature of the contractual arrangement between Evers and AmQuip recorded in the Evers-AmQuip Agreement is determined by which contractee had control of the subject crane's operation.

60.     At all material times on the Project, under the Evers-AmQuip Agreement the AmQuip operating engineer retained exclusive control over the method and manner in which he operated the AmQuip crane.

61.     The Evers-AmQuip Agreement constituted a service contract.

62.     The Evers-AmQuip Agreement did not constitute an equipment lease.

63.     The Evers-AmQuip Agreement provides that the subject crane was to be made available for pickup in Cincinnati, Ohio.

9

64.     The Evers-AmQuip Agreement provides that the subject crane was to be made available for use in construction on the Project located in West Chester, Ohio.

65.     The Evers-AmQuip Agreement provides that actions arising from or related to the agreement "shall be brought exclusively under the jurisdiction, venue and laws of the state or federal courts of Pennsylvania, with the sole application of laws of Pennsylvania in all actions whether or arbitration or court proceedings."

66.     The above quoted language constitutes a choice-of-law provision.

67.     Ohio law provides that a choice-of-law provision like that set forth in the Evers-AmQuip Agreement is "void and unenforceable as against public policy."

68.     The Evers-AmQuip Agreement is subject to the laws of Ohio.

69.     The Pennsylvania choice-of-law provision in the Evers-AmQuip Agreement is void and unenforceable as against public policy.

70.     The Evers-AmQuip Agreement provides that Evers indemnifies AmQuip and holds it harmless for all property damage whether caused by AmQuip.

71.     An indemnity provision like that in the Evers-AmQuip Agreement by which a promissor like Evers indemnifies a promissee like AmQuip against liability for its own conduct is "against public policy and is void" under Ohio law.

72.     Under applicable Ohio law, Evers was not obligated under the Evers-AmQuip Agreement to indemnify AmQuip for damages resulting from AmQuip's own conduct.

73.     Under applicable Ohio law, Evers was not obligated under the Evers-AmQuip Agreement to indemnify AmQuip for damages resulting from the conduct of AmQuip's operating engineer operating AmQuip's crane on the Project on August 5, 2006.

74.    Evers did not assume liability in the Evers-AmQuip Agreement to pay damages for property damage incurred by AmQuip caused by AmQuip's own conduct.

75.    Evers did not assume a liability in the Evers-AmQuip Agreement to pay damages for property damage incurred by AmQuip caused by the conduct of AmQuip's operating engineer operating AmQuip's crane on the Project on August 5, 2006.

**D.**    **The August 5, 2006 Accident**.

76.    On August 5, 2006, Evers was erecting and installing tilt-up building panels on the Project using the AmQuip crane and crew.

77.    On August 5, 2006, the AmQuip crane was being operated by the AmQuip operating engineer, Mark Snelling.

78.    The AmQuip operating engineer, Mr. Snelling, had not worked on this Project before August 5, 2006.

79.    On August 5, 2006 the AmQuip operating engineer used the AmQuip crane during the day to make several lifts of the tilt-up building panels and erect and install these on the building without incident.

80.    At all times during each of the lifts made on August 5, 2006, the AmQuip operating engineer maintained exclusive control over the manner and method by which each lift was made.

81.    While he was in the process of making the last lift of the day on August 5, 2006 of the tilt-up building panels, the AmQuip operating engineer failed to follow standard procedures for such a lift and lost control of the lifted panel.

82.    When the AmQuip operating engineer lost control of the rigged tilt-up building panel being lifted, that panel swung into and struck another such panel that had already been erected and installed.

83.     The force of the rigged panel striking the already erected/installed panel caused the erected/installed panel to be displaced from its mooring and to collapse.

84.     The collapsed panel struck the AmQuip crane.

85.     The AmQuip crane sustained property damages as a result of being struck by the collapsed panel.

86.     The collapsed panel also struck part of the surrounding construction site causing property damage.

87.     The AmQuip operating engineer's loss of control of the rigged tilt-up building panel was an unintended and unexpected happening.

88.     The AmQuip operating engineer's loss of control of the rigged tilt-up building panel was not done with the intent or expectation of causing damage or injury.

89.     The AmQuip operating engineer's loss of control of the rigged tilt-up building panel was an unusual, fortuitous, unexpected, and unforeseen event.

90.     The AmQuip operating engineer's loss of control of the rigged tilt-up building panel was an accident.

91.     The rigged tilt-up building panel's striking of the already erected/installed panel was an unintended and unexpected happening.

92.     The rigged tilt-up building panel's striking of the already erected/installed panel was not done with the intent or expectation of causing damage or injury.

93.     The rigged tilt-up building panel's striking of the already erected/installed panel was an unusual, fortuitous, unexpected, and unforeseen event.

94.     The rigged tilt-up building panel's striking of the already erected/installed panel was an accident.

95.     The collapse of the previously erected/installed panel was an unintended and unexpected happening.

96.     The collapse of the previously erected/installed panel was an unusual, fortuitous, unexpected, and unforeseen event.

97.     The collapse of the previously erected/installed panel was an accident.

98.     The property damage to the AmQuip crane constituted collateral damage under the WSLIC CGL Policy.

99.     The property damage to the AmQuip crane constituted consequential damage under the WSLIC CGL Policy.

100.    The property damage to the surrounding construction site constituted collateral damages under the WSLIC CGL Policy.

101.    The property damage to the surrounding construction site constituted consequential damages under the WSLIC CGL Policy.

**E.      AmQuip's Claims/Evers' Requests for Coverage/Westchester's Denials**.

102.    On August 7, 2006 Evers notified Westchester of the crane incident and of a potential claim for property damage.

103.    On September 7, 2006, WSLIC denied coverage for property damage arising out of the crane incident relying on WSLIC CGL Policy Exclusion j.4 – the "personal property in the care, custody or control of the insured" exclusion.

104.    On or about November 2007, AmQuip by its subrogee Hanover Insurance Company of America ("Hanover") brought a Demand and Claim for Arbitration against Evers for property damage to the AmQuip crane.

105.    Evers notified WSLIC of the Hanover Demand and Claim, and requested coverage under the WSLIC CGL Policy.

106.    As a part of its consideration of Evers' request for coverage, WSLIC reviewed the AmQuip Rental Agreement (Exhibit B).

107.    As a part of its consideration of Evers' request for coverage, WSLIC knew and described the sequence of events that caused the AmQuip crane damage as: "the rigged panel struck an already erected panel, which struck the crane and damaged it."

108.    On December 4, 2007 WSLIC denied Evers' request for coverage against the AmQuip/Hanover Demand and Claim relying on WSLIC CGL Policy Exclusions b – the contractual liability exclusion; j.1 – property damage to property rented by the insured; j.3 – property damage to property loaned to the insured; and j.4 – personal property in the care, custody or control of the insured.

109.    On June 25, 2008, Hanover as subrogee of AmQuip filed a Complaint in the United States District Court for the Western District of Pennsylvania, Civil Action No. 08-00879 ("Hanover litigation") asserting a Breach of Contract claim that Evers breached the Evers-AmQuip Agreement (Exhibit B) to indemnify AmQuip for damage to the subject AmQuip crane, and seeking $1,004,492.88 in damages..

110.    On or about July 2, 2008, Evers notified Westchester of the Hanover Complaint and litigation and requested coverage, including duty to defend and indemnity, under the WSLIC CGL Policy.

111.    On July 31, 2008, Westchester denied Evers' request for coverage relying on its previous denials, and reiterating its reliance on WSLIC CGL Policy exclusions b, j.1, j.3, and j.4.

112.    On November 25, 2008, Hanover filed an Amended Complaint in its action against Evers adding a second count for Negligence alleging that Evers' negligent conduct caused the property damage to the subject AmQuip crane.

113.    Evers notified WSLIC of, and provided WSLIC with a copy of, Hanover's Amended Complaint, and requested coverage for both defense and indemnity under the WSLIC CGL Policy regarding the Hanover litigation.

114.    WSLIC did not respond to Evers' request for such coverage under the Policy against the Hanover Amended Complaint and litigation.

115.    On April 13, 2009, Intervening Plaintiffs Certain Underwriters at Lloyds, London and CCMSI filed an Intervening Complaint in the Hanover litigation against Evers as subrogees to AmQuip for the sum of $45,580.68 that these subrogees had paid on AmQuip's behalf for damage to the Project property.

116.    The Intervening Plaintiffs in the Hanover litigation asserted claims for contractual indemnification, common law indemnification, and contribution against Evers.

117.    Evers notified WSLIC, and provided it with a copy of, the Intervening Complaint, and requested coverage for both duty to defend and duty to indemnify under the WSLIC CGL Policy regarding the Intervening Complaint.

118.    WSLIC did not respond to Evers' request for such coverage against the Intervening Complaint.

**F.    Evers' Litigation Costs and Settlement Payment**.

119.    Evers retained counsel and incurred attorney fees to defend itself against the claims of AmQuip and its subrogees Hanover and Lloyds of London/CCMSI.

120.    Evers also incurred costs and expenses in defending against AmQuip and its subrogees' claims.

121.    Evers incurred costs of defense against the AmQuip and related subrogees' claims totaling $81,744.00, plus interest.

122.    On October 20, 2009, Evers settled the Hanover litigation paying the Plaintiffs – Hanover and Lloyds of London/CCMSI – a total of $50,000.00 for release of all of their and AmQuip's respective claims against Evers.

123.    The $50,000.00 amount paid by Evers in settlement of the Hanover litigation was reasonable.


G.    **Willful and Knowing Nature of WSLIC's Denials of Coverage**.

124.    At all times that WSLIC denied Evers' requests for coverage under the WSLIC CGL Policy, both duty to defend and duty to indemnify, against the claims of AmQuip and, as applicable, its related subrogees, WSLIC knew or should have known that:

a.    the Evers-AmQuip Agreement (Exhibit B) was subject to the laws of Ohio;

b.    the indemnity provision in the Evers-AmQuip Agreement (Exhibit B) relied upon by AmQuip and its related subrogees was void as against the public policy of Ohio;

c.    the Evers-AmQuip Agreement (Exhibit B) did not obligate Evers to pay damages to AmQuip or its related subrogees;

d.    Evers did not assume a liability in the Evers-AmQuip Agreement (Exhibit B) to pay damages to AmQuip or its related subrogees;

e.    the indemnity language relied upon by AmQuip and its related subrogees had no relevance, materiality, or application to WSLIC's investigation, consideration, and deliberation of

16

the facts and circumstances surrounding Evers' requests to WSLIC for insurance coverage, both

duty to defend and duty to indemnify, and to its decisions to deny such requests; and,

       f.      the contractual liability exclusion, WSLIC CGL Policy Exclusion b, did not

apply to Evers' requests for coverage so as to exclude these.

       125.    At all times that WSLIC denied Evers' requests for coverage under the WSLIC CGL

Policy, both duty to defend and duty to indemnify, against the claims of AmQuip and, as applicable,

its related subrogees, WSLIC knew or should have known that:

       a.      under the Evers-AmQuip contract, AmQuip provided the operating engineer

for the AmQuip crane;

       b.      the AmQuip operating engineer retained exclusive control over the manner

and method of the crane's operation during its lifts of the tilt-up building panels;

       c.      the assistance provided by Evers' personnel to the AmQuip operating

engineer during the lift of the tilt-up building panels did not remove the AmQuip crane's operation

from the AmQuip operating engineer's exclusive control of the method and means of such lifts;

       d.      Evers did not have care, custody, or control of the AmQuip crane during the

tilt-up building panel lifts, including the one involved in the subject incident, sufficient for WSLIC

to rely upon WSLIC CGL Policy Exclusion j 4;

       e.      Evers did not rent the personal property of the crane involved in the subject

incident such that WSLIC could rely upon WSLIC's CGL Policy exclusion j.1 to exclude coverage

for property damage to "property" that Evers rented; and

       f.      AmQuip did not loan "property" to Evers such that WSLIC could rely on

WSLIC's CGL Policy Exclusion j.3 to exclude coverage for the property damages caused to the

personal property of the crane itself.

126.     At all times that WSLIC denied Evers' requests for coverage under the WSLIC CGL Policy, both duty to defend and duty to indemnify, against the claims of AmQuip and, as applicable, its related subrogees, WSLIC knew or should have known that:

a.     the property damage for which Evers sought coverage under the WSLIC CGL Policy, both duty to defend and duty to indemnify, was caused when, as summarized by WSLIC, "the rigged panel struck an already erected panel, which struck the crane and damaged it,"

b.     the property damage to the crane was caused by an accident;

c.     the property damage to the crane constituted covered collateral damage under the WSLIC CGL Policy; and,

d.     the property damage to the crane constituted covered consequential damages under the WSLIC CGL Policy.

127.     At all times that WSLIC denied Evers' requests for coverage under the WSLIC CGL Policy, both duty to defend and duty to indemnify, against the claims of AmQuip and, as applicable, its related subrogees, WSLIC knew or should have known that:

a.     the manner in which the AmQuip crane was damaged, as summarized by WSLIC as occurring when "the rigged panel struck an already erected panel, which struck the crane and damaged it," was:

i.     unexpected and unintended;

ii.     unusual, fortuitous, unexpected, and unforeseen; and

iii.     accidental.

128.     WSLIC willfully, intentionally, maliciously, recklessly, negligently, and otherwise wrongfully and repeatedly denied Evers' requests for coverage under the WSLIC CGL Policy, both

duty to defend and duty to indemnify, against the claims brought against Evers by AmQuip and its related subrogees.

## COUNT I

### (Breach of Contract)

129.    Evers adopts and realleges paragraphs 1 through 128 above.

130.    Evers and WSLIC entered into the WSLIC CGL Policy.

131.    Evers complied with all of its obligations under the WSLIC CGL Policy.

132.    AmQuip, Hanover in its Complaint and Amended Complaint,  and Lloyds of London/CCMSI in its Intervening Complaint stated claims against Evers potentially or arguably within the WSLIC CGL Policy coverage.

133.    The WSLIC CGL Policy covered Evers' losses, including its litigation costs and settlement amount, incurred in dealing with the AmQuip, Hanover, and Lloyds of London/CCMSI claims.

134.    WSLIC was obligated by the WSLIC CGL Policy to provide Evers with a defense against and indemnity for the claims brought against it by AmQuip and its subrogees Hanover and Lloyds of London/CCMSI.

135.    WSLIC wrongfully denied Evers a defense against and indemnity for the claims of AmQuip, Hanover, and Lloyds of London/CCMSI claims.

136.    WSLIC breached its WSLIC CGL Policy with Evers.

137.    As a direct and proximate cause of WSLIC's breach of the WSLIC CGL Policy contract with Evers, Evers has incurred monetary damages in an amount in excess of $75,000.00, exclusive of costs and interest, which amount will be further determined by the trier of fact at the trial.

## COUNT II

### (Declaratory Judgment)

138.    Evers adopts and realleges paragraphs 1 through 137 above.

139.    Evers made repeated requests to WSLIC for coverage under the WSLIC CGL Policy, both duty to defend and duty to indemnify, regarding the AmQuip, Hanover, and Lloyds of London/CCMSI claims.

140.    WSLIC repeatedly rejected Evers' requests for such coverage, and asserted that no such requested coverage existed under the WSLIC CGL Policy.

141.    There exists a justicable and actual controversy between Evers and WSLIC over the existence of coverage under the WSLIC CGL Policy regarding the AmQuip, Hanover, and Lloyds of London/CCMSI claims.

142.    The issue before the Court is the existence of coverage under the WSLIC CGL Policy for Evers with respect to the AmQuip, Hanover, and Lloyds of London/CCMSI claims.

143.    A declaration of rights of Evers and WSLIC will terminate the uncertainty between them regarding the scope of the WSLIC CGL Policy, and will put and end to the parties' present controversy.

144.    Evers' requests that the Court enter a declaratory judgment declaring that the AmQuip, Hanover, and Lloyds of London/CCMSI claims are covered by the WSLIC CGL Policy, and that WSLIC owed a duty to Evers to defend and indemnify it against these claims.

## COUNT III

### (Breach of Duty of Good Faith and Fair Dealing)

145.    Evers adopts and realleges paragraphs 1 through 144 above.

146.    Implied in the WSLIC CGL Policy was a covenant of good faith and fair dealing whereby WSLIC agreed that it would deal with Evers fairly and honestly and do nothing to interfere with, impair, hinder, or potentially injure the rights of Evers to receive the benefits of the WSLIC CGL Policy.  WSLIC further had a duty to honor the contractual obligations in its WSLIC CGL Policy, and to have a reasonable basis and justification for its actions towards Evers.

147.    Evers complied with its obligations under the WSLIC CGL Policy.

148.    The WSLIC CGL Policy obligated WSLIC to provide Evers with a defense against and indemnification for the claims brought against it by AmQuip and its subrogees, Hanover and Lloyds of London/CCMSI.

149.    WSLIC wrongfully refused to perform its duties to defend and to indemnify Evers against the AmQuip, Hanover, and Lloyds of London/CCMSI claims, doing so without reasonable basis in law or in fact, thereby breaching its duties of good faith and fair dealing owed to Evers.

150.    WSLIC acted in bad faith towards Evers when it wrongfully refused to provide it with defense and indemnity against the claims of AmQuip, Hanover, and Lloyds of London/CCMSI.

151.    WSLIC's breach of its covenant of good faith and fair dealing owed to Evers, and its conduct constituting bad faith in its dealings with Evers, included but is not limited to:

- Relying on the contractual liability exclusion, WSLIC CGL Policy Exclusion b, to deny Evers' requests for defense and indemnity against the AmQuip, Hanover, and Lloyds of London/CCMSI claims when, on its face the Evers-AmQuip Agreement (Exhibit B), which WSLIC reviewed before issuing its denials, demonstrated that the indemnity language relied upon by WSLIC was void as against public policy;

- Relying on the care, custody, and control exclusion, and related property an insured rented and property loaned to an insured exclusions, WSLIC CGL Policy Exclusions j 4, 1 and 3 respectively, when WSLIC knew that AmQuip's operating engineer retained exclusive control over the method and means of the operation of the crane during lifting operations, including the one involved in the subject crane incident;

- Denying Evers' requests for defense and indemnity against the AmQuip, Hanover, and Lloyds of London/CCMSI claims for property damage to the AmQuip crane and

to the surrounding construction site when WSLIC knew that these property damages were collateral and/or consequential damages, covered under the WSLIC CGL Policy, because these damages were caused when "the rigged panel struck an already erected panel, which struck the crane and damaged it;" and,

- Denying Evers' requests for defense and indemnity against the AmQuip, Hanover, and Lloyds of London/CCMSI claims for property damage to the AmQuip crane and to the surrounding construction site when WSLIC knew that these damages were the result of an unintended, unexpected, unforeseen, fortuitous, and unusual accident because these damages resulted when "the rigged panel struck an already erected panel, which struck the crane and damaged it."

152.     As a direct and proximate result of WSLIC's breach of its duty of good faith and fair dealing, and its bad faith conduct in its dealings with its insured, Evers has been injured and damaged, and is entitled to recover from WSLIC compensatory and punitive damages, as well as its expenses, court costs, and attorney fees, plus interest, in an amount to be determined by the trier of fact at trial.

WHEREFORE, Evers requests a judgment:  (1) for compensatory and punitive damages in am amount in excess of $75,000.00 to be further determined by the trier of fact at trial; (2) for a declaration that under the WSLIC CGL Policy WSLIC was obligated to defend and indemnify Evers against the subject claims brought against it; (3) for recovery of its costs, expenses, attorney fees, plus interest; and, (4) for recovery of any and all other relief to which it may be entitled.

/s/ Kent W. Seifried_____
Kent W. Seifried
POSTON, SEIFRIED & SCHLOEMER
2039 Dixie Highway
Ft. Mitchell, Kentucky  41011
Telephone:  (859) 431-3200
Facsimile:   (859) 655-7765
E-Mail:  kwspsslawfirm@fuse.net

Attorney for Plaintiff, Evers Welding Company, Inc.

22

# **JURY DEMAND**

Evers Welding Company, Inc. hereby demands a trial by jury on all issues so triable.


/s/ Kent W. Seifried_____
Kent W. Seifried